In re ESTATE OF Terrence GILLIS.

District of Columbia, Appellant.

No. 00–PR–379.

District of Columbia Court of Appeals.

Submitted Nov. 18, 2003.
Resubmitted March 1, 2004.
Decided May 20, 2004.

---

Arabella W. Teal, Interim Corporation Counsel at the time, Charles L. Reischel, Deputy Corporation Counsel at the time, Tonya Robinson, Acting Deputy Corpora-tion Counsel at the time, and Richard A. Williams, Assistant Corporation Counsel, Washington, filed a brief for the District of Columbia.

John H. Pickering, Christopher J. Herrling, Andrew R. Varcoe, and Kelly Thompson Cochran, Washington, filed a brief as amicus curiae.*

Before FARRELL and RUIZ, Associate Judges, and NEBEKER, Senior Judge.

FARRELL, Associate Judge.

The District of Columbia appeals from an order of the Superior Court denying the District's petition for appointment of a limited guardian for Terrence Gillis, an incapacitated individual, pursuant to D.C.Code § 21–2001 *et seq.* (2001).[1] Since the 1970's, Mr. Gillis has been committed to a facility operated or licensed by the District of Columbia for District residents who are mentally retarded. The petition for appointment of a guardian, filed by the District of Columbia Mental Retardation and Development Disabilities Administration (MRDDA), was accompanied by affidavits attesting that Gillis is an incapacitated individual for whom a guardian is necessary to provide continuing care and supervision.

The trial judge denied the petition because of her belief—reflected in the transcript of a hearing and a written order in a related case—that the MRDDA has the statutory authority and ability to provide ordinary medical care for Mr. Gillis; that "there's no real crisis going on" with re-

---

* Because this appeal originally had been briefed by the District of Columbia and no one else, we removed the case from the calendar and requested John H. Pickering, a member of the Bar, to file a brief as *amicus curiae*. We express our gratitude to Mr. Pickering and the members or associates of Wilmer Cutler Pickering LLP for their assistance in resolving this appeal.

1. *See* D.C.Code § 21–2011(11) (defining "incapacitated individual"); *id.* § 21–2044(c) (court "may limit the powers of a guardian otherwise conferred by this chapter and create a limited guardianship").

spect to Gillis' health care status and needs; and that the Gillis petition presaged the "wholesale" filing of petitions by MRDDA for appointment of guardians to represent its customers, with resulting depletion of the court's limited guardianship fund.

We vacate the trial court's decision and remand for further consideration of the petition. As we explain in the following, the existing record weighs heavily in favor of appointment of a limited guardian for Gillis, without regard to the merits of other petitions the MRDDA may have filed or plans to file. Of particular importance is Gillis' status in pending federal court litigation in which a consent decree entered into by the District required it to seek appointment of a guardian strictly for Gillis among the class of plaintiffs in that lawsuit. We nevertheless do not order the trial judge to appoint a guardian, for the reason alone that more than four years have elapsed since the District's request for the appointment:[2] the issue of whether appointment of a guardian for Gillis is necessary must take into account any changes in his condition and status during the intervening time.

## I.

Mr. Gillis, who was 33 years old at the time of the petition, had resided at the District's Forest Haven facility for the mentally retarded for nine years when it closed in 1984. At the time of the petition, he lived at an Intermediate Care Facility (ICF/MR) licensed by the District where he received therapeutic behavioral and medical treatment. He functions at the profound range of mental retardation adaptively and cognitively, and requires verbal and physical assistance in most areas of self-help and daily living skills. His communication skills are at the one-year level, while his socialization skills are at the ten-month level. Although he can feed himself, he depends upon staff in most areas of personal care and does not travel independently or possess concepts of time or money. On at least one occasion he was hospitalized for a self-inflicted injury. Owing to his medical condition and the severity of his retardation, he can only be maintained at the ICF/MR level of placement.

Gillis is also a member of the class of plaintiffs in the so-called *Evans* litigation in the United States District Court for the District of Columbia, in which suit was brought against the District as far back as 1976 on behalf of former residents of the Forest Haven residential facility. *Evans v. District of Columbia,* C.A. No. 76–0293 (D.D.C.); *see Evans v. Washington,* 459 F.Supp. 483 (D.D.C.1978).[3] The litigation has been complex and protracted, but, as relevant here, it resulted in a December 1999 consent decree addressing the needs of thirteen individual *Evans* plaintiffs, including Gillis, whom Department of Justice consultants had identified as "in need of immediate remedial action." Because of, among other things, persistent behavioral problems that had led to Gillis' hospitalization and jeopardized his placements, the decree required the District of Columbia to "promptly file a motion for the appoint-

---

**2.** The record on appeal contains an inexplicable gap of nearly two and a half years between the designation of the record and the preparation of a single transcript eight pages in length.

**3.** In *Evans v. Washington, supra,* the District consented to entry of an order and judgment requiring it, among other things, to develop an individualized habilitation plan for each class member permitting him or her to "liv[e] as normally as possible and receiv[e] appropriate individualized services in the community in the least separate, most integrated and least restrictive settings." *Evans,* 459 F.Supp. at 484.

ment of a limited guardianship for medical decisionmaking for [Gillis]."[4] No similar directive was issued for any of the other class members who were the subject of the order.

## II.

In contending that the Superior Court judge erred in refusing to appoint a guardian, the District relies significantly on the agreement it made in the federal *Evans* litigation. Initially, however, it argues that the trial judge was mistaken in believing that the MRDDA has the statutory authority to provide ordinary medical care for persons like Mr. Gillis. The District acknowledges that legislation enacted by the D.C. Council beginning in 1998 has expanded the authority of the Administrator of the MRDDA to act on behalf of a customer,[5] but it contends that these amendments cover only "emergency situation[s]" and do "not provide for a decisionmaker for preventive health care or ongoing health treatment." Br. for District at 14; *see also id.* ("[I]n instances that fall[ ]outside [an] 'emergency situation' when the MRDDA Administrator [is] powerless to give consent, Mr. Gillis is left without adequate medical care."). By contrast, as the District correctly points out, the Superior Court is entrusted with authority to "appoint a guardian as requested if it is satisfied that the individual for whom a guardian is sought is incapacitated and that the appointment is necessary as a means of providing continuing care and supervision of the person of the incapacitated individual." D.C.Code § 21–2044(b).

The trial judge did not dispute her authority to appoint a guardian; her concern, rather, was the need to do so where "no real crisis going on" with respect to Gillis' health care needs had been cited to her and where, in her view, MRDDA possessed adequate statutory authority to provide ordinary care to Gillis and make health-care decisions for him. We conclude that, although the judge more accurately assessed the MRDDA's authority than has the District in its brief, there nevertheless are limitations on the MRDDA's decision making power that make the case for appointment of a guardian stronger than the judge understood it to be.

Contrary to the District's suggestion, the statutes regarding care and treatment of mentally retarded persons do not limit MRDDA's authority to make health-care decisions to emergency situations. Substituted consent legislation originally enacted in 1998 permits the MRDDA Administrator to "grant, refuse, or withdraw consent on behalf of a customer [who has no known person available and willing to exercise consent on his or her behalf] with respect to the provision of *any* health care service, treatment, or procedure ... [that] is clinically indicated to maintain the health of the customer" (emphasis added), provided two physicians have concurred in this determination. *See* Mentally Retarded Citizens Substituted Consent for Health Care Decisions & Emergency Care Definition Temporary Amendment Act of 1998, D.C. Act 12–588, § 3(a), 46 D.C.Reg. 1115 (1998) (amending D.C.Code § 7–1305.07).[6]

---

4.  The order used a pseudonym to refer to Mr. Gillis.

5.  A "customer" for purposes of the District's statute governing mentally retarded citizens is "a person admitted to or committed to a facility pursuant to [provisions of this statute]

for habilitation or care." D.C.Code § 7–1301.03(8B).

6.  The District's references to "emergency care" in its brief arise from the fact that the same legislation amended Title 21 of the D.C.Code to permit the appointment by the court of emergency guardians who may make

The problem with this authority, however, is that it is limited in both scope and time, and therefore does not obviate the need in certain circumstances to appoint individual decision makers to act on behalf of mentally retarded persons such as Gillis who have behavior problems.

First, the MRDDA's statutory authority is limited in scope. The substituted consent legislation does allow the MRDDA to make routine medical decisions without going through the time and expense of a formal guardianship petition. But without seeking court permission, the Administrator may not authorize (a) an abortion, sterilization, psycho-surgery, or removal of a bodily organ except to prevent death or serious impairment of the customer's physical health; (b) convulsive therapy; (c) experimental treatments or behavior modification programs involving aversive stimuli or deprivation of rights; or (d) the withholding of life-saving medical procedures. *Id.* (amending D.C.Code § 7–1305.07).[7] Second, and equally important, the MRDDA's statutory authority is not permanent. The substituted consent legislation cited above has repeatedly been enacted using a patchwork of emergency and temporary measures that at most have lasted for 225 days at a time. Most recently, for example, D.C. Act 15–268[8] underwent Congressional review without objection and will be effective until October 21, 2004. There is no assurance that the

D.C. Council will continue to renew the MRDDA's authority indefinitely.

In short, the substituted consent legislation does not create either a permanent or a complete alternative to court-designation of individuals to make health-care decisions on behalf of the MRDDA's customers. The temporary legislation does reveal an ongoing purpose of the Council to minimize the procedural obstacles the MRDDA historically faced in obtaining routine health care for customers who lack guardians or family members available to consent on their behalf. But it cannot be said to discourage or disfavor the designation of individual decision makers—including guardians—who can focus on those customers' particularized needs and preferences.

### III.

Our decision to vacate the trial court's order, however, does not rest on these general considerations alone. By themselves, the limitations described above could be argued to justify the appointment of a guardian for all or many of the MRDDA's customers, thereby confirming the trial judge's fear of an impending request by the MRDDA for the "wholesale appointment of guardians" paid from the Superior Court's limited guardianship fund. At the hearing on the Gillis petition, the District's counsel did not allay that concern when he explained to the judge

medical decisions for their wards in "life threatening situation[s] or . . . situation[s] involving emergency care." *Id.* § 2(a), (b) (amending D.C.Code §§ 21–2011, –2046). These provisions, however, do not purport to limit or affect the MRDDA Administrator's authority under D.C.Code § 7–1305.07 as amended.

7. *Cf.* D.C.Code § 21–2047(c) (permitting court-appointed guardians, if expressly authorized to do so in order of appointment, to authorize abortion, sterilization, psycho-sur-

gery, removal of bodily organs, convulsive therapy, experimental treatment or research, behavior modification programs involving aversive stimuli, and, under certain circumstances, the withholding of life-saving medical procedures).

8. The Citizens with Mental Retardation Substituted Consent for Health Care Decisions Temporary Amendment Act of 2003, D.C. Act 15–268 (approved Dec. 18, 2003), 51 D.C.Reg. 27 (Jan. 2, 2004).

that in the *Evans* litigation in federal court the District had agreed "that *all* the MRDDA clients shall get a guardian . . . because they're not competent to give [medical] consent" (emphasis added).

In fact, however, the *Evans* order agreed to by the District provided that for a single member of the plaintiff-class only, Mr. Gillis, the District would "promptly file a motion for the appointment of a limited guardianship." The reasons for this special provision are reflected in the consultants' reports which, though intended to be confidential in their specifics, revealed generally that the District had had considerable difficulty in designing effective behavioral treatment and modification programs for Mr. Gillis. Moreover, a physician's affidavit attached to the guardianship petition stated that in view of Gillis' "impulsive behavior and medical/mental condition[,] . . . he may need acute intervention . . . in the future which would require consent from either family or a legally appointed guardian."

The issue before us, therefore, is whether special circumstances favor the appointment of a guardian for Mr. Gillis, not any other of the MRDDA's customers; and we hold that on the record presented, the case for an appointment has been presumptively made. The District argues in broad terms that "the failure to appoint a guardian to make health care decisions for Mr. Gillis violates the *Evans* [c]onsent [d]ecree and federal regulations" (Br. for District at 17). It is apparent, though, that the decree required the District to *request* ap-

pointment of a guardian; it did not purport to require actual appointment by the Superior Court—something the federal court no doubt would have been hesitant to attempt. Yet the District Court was plainly of the view that a guardian is necessary to assist in medical decisionmaking for Mr. Gillis, and we think that simple comity requires that the court's view—concurred in by all of the *Evans* parties—be treated with great respect.[9] As for the relevant federal regulations, *amicus* correctly points out that, while they do not directly mandate the appointment of a guardian for persons such as Gillis, they place heavy emphasis on the need for informed consent by customers, family members, or guardians,[10] and it is not clear whether MRDDA qualifies to give that consent. Moreover, the expert opinion of a physician that "acute intervention" may yet be needed to control or modify Mr. Gillis' behavior raises the question, unique to him on this record, whether the MRDDA's authority under the D.C.Code extends to consent to the kinds of intervention—"experimental treatments or behavior modification programs involving aversive stimuli or deprivation of rights," D.C.Code § 7–1305.07 (as amended)—that conceivably will be necessary in Gillis' case.

For all of these reasons, we vacate the trial court's order and remand for reconsideration of the appointment decision. Although the record before us weighs strongly in favor of appointment of a guardian, that decision must first take into

---

**9.** *Cf. Streater v. Jackson,* 223 U.S.App. D.C. 393, 395, 691 F.2d 1026, 1028 (1982) (applying principle that "relations between the District of Columbia and federal systems should not be disturbed by unnecessary conflict between courts equally bound to guard and protect [individual] rights") (citation and internal quotation marks omitted).

**10.** *See, e.g.,* 42 C.F.R. § 483.440(f)(3)(ii), governing programs designed to manage a mentally retarded person's inappropriate behavior where these programs involve risks to the person's protection and rights, and requiring that such programs may be conducted "only with the written informed consent of the client, parent (if the client is a minor), or legal guardian."

account whatever changes in Mr. Gillis' condition or status may have occurred during the time since the District's petition was filed.

*So ordered.*