# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued February 6, 2007          Decided June 12, 2007

No. 05-7190

JANE DOE, I, BY HER NEXT FRIEND LINDA J. TARLOW, ET AL.,
APPELLEES

v.

DISTRICT OF COLUMBIA AND
MENTAL RETARDATION AND DEVELOPMENTAL DISABILITIES
ADMINISTRATION,
APPELLANTS

Appeal from the United States District Court
for the District of Columbia
(No. 01cv02398)

*Mary T. Connelly*, Assistant Attorney General, Office of Attorney General for the District of Columbia, argued the cause for appellants. With her on the brief were *Robert J. Spagnoletti*, Attorney General at the time the brief was filed, *Todd S. Kim*, Solicitor General, and *Edward E. Schwab*, Deputy Solicitor General.

*Robert A. Dybing*, pro hac vice, argued the cause for appellees. With him on the brief was *Harvey S. Williams*.

Before: GRIFFITH and KAVANAUGH, *Circuit Judges,* and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: This case involves the District of Columbia's 2003 policy for authorizing surgeries for intellectually disabled persons who are in the District's care and have never had the mental capacity to make medical decisions for themselves. The District of Columbia authorizes surgeries for such persons when: (i) two physicians have certified that the proposed surgery is "clinically indicated to maintain the health" of the patient; (ii) D.C. caregivers have made efforts to discuss the surgery with the patient at the level of patient comprehension; and (iii) no guardian, family member, or other close relative, friend, or associate is available to otherwise consent or withhold consent. Plaintiffs argue that the 2003 policy is inconsistent with D.C. statutes and the Due Process Clause of the Fifth Amendment. We disagree and therefore reverse the judgment of the District Court.

I

1. Jane Doe I, Jane Doe II, and Jane Doe III live in District of Columbia facilities for the intellectually disabled. They are plaintiffs here, and they represent a class certified by the District Court of intellectually disabled persons who live in District of Columbia facilities and receive medical services from the District of Columbia. These individuals have never had the mental capacity to make medical decisions for themselves. (Some District of Columbia statutes and cases use the term "mentally retarded"; we will use the more common term "intellectually disabled.")

The District of Columbia Mental Retardation and Developmental Disabilities Administration (commonly referred to as the MRDDA although the official name has now changed to the Department of Disability Services) ensures that those

intellectually disabled individuals receive necessary medical services, including necessary surgeries. Many of the surgeries MRDDA authorizes are relatively routine; MRDDA also authorizes more significant surgeries when medically necessary.

The District of Columbia's Health Care Decisions Act provides that any individual, including persons who have been determined to be intellectually disabled, "shall be presumed capable of making health-care decisions unless certified otherwise" in accordance with D.C. law. D.C. Code § 21-2203. Of course, some individuals may not have the mental capacity to make healthcare decisions for themselves. The D.C. Code sets out a procedure to make the mental incapacity determination. The Code provides: "Mental incapacity to make a health-care decision shall be certified by 2 physicians who are licensed to practice in the District and qualified to make a determination of mental incapacity." *Id.* § 21-2204(a). At least one of the two certifying physicians must be a psychiatrist, and at least one must have examined the individual in question within one day of the certification of incapacity. *Id.* The physicians must apply the following standard: A person lacks mental capacity to make healthcare decisions if he or she "lacks sufficient mental capacity to appreciate the nature and implications of a health-care decision, make a choice regarding the alternatives presented or communicate that choice in an unambiguous manner." *Id.* § 21-2202(5). "All professional findings and opinions forming the basis of [the] certification . . . shall be expressed in writing . . . and provide clear evidence that the person is incapable of understanding the health-care choice, making a decision concerning the particular treatment or services in question, or communicating a decision even if capable of making it." *Id.* § 21-2204(b).

Mental incapacity to make a healthcare decision "shall not be inferred from the fact that an individual . . . [i]s mentally

retarded." *Id.* § 21-2203(2). In other words, under D.C. law, not all intellectually disabled persons lack the mental capacity to make healthcare decisions. The two inquiries are separate. Plaintiffs' counsel here agrees, however, that all of the class members in this case lack the mental capacity to make healthcare decisions. *See* Tr. of Oral Arg. at 21, 27; *see also Does I Through III v. District of Columbia*, 232 F.R.D. 18, 32 (D.D.C. 2005).

D.C. law creates a hierarchy of individuals authorized to make healthcare decisions for persons who have been certified under § 21-2204 as lacking mental capacity. *See* D.C. Code § 21-2210(a), (d), (f). That list includes, in order of priority: a court-appointed guardian or conservator; a spouse or domestic partner; an adult child; a parent; an adult sibling; a religious superior, if applicable; a close friend; or the nearest living relative. *Id.* § 21-2210(a). The MRDDA Administrator makes healthcare decisions for an incapacitated patient only if none of the above individuals is available and willing to do so. *See In re Estate of Gillis*, 849 A.2d 1015,1018-19 (D.C. 2004) (providing overview of MRDDA's statutory authority to make healthcare decisions for intellectually disabled patients). The D.C. Code also explicitly provides that abortions, sterilizations, and psycho-surgeries may not be authorized, at least absent a court order. D.C. Code § 21-2211.

Of relevance to this case, D.C. law distinguishes between two categories of persons who lack mental capacity: (i) those who once possessed mental capacity, such as those in a coma or who have lost their mental capacity due to age, disease, or an accident; and (ii) those who have *always* lacked mental capacity, such as certain intellectually disabled persons. For patients who once had mental capacity, the decision must be based on the "known wishes of the patient" if those wishes can be "ascertained" – for example, as expressed in a durable power of

attorney. *Id.* § 21-2210(b); *see also id.* §§ 21-2206(c)(1), 21-2207. For those who have never had the mental capacity, the decision must be based on "a good faith belief as to the best interests of the patient." *Id.*

In 2003, MRDDA adopted a new policy for medical care of intellectually disabled persons in order to meet – and exceed – the statutory requirements. The policy, entitled "Procedures for Securing Medical and Dental Care for MRDDA Consumers," provides that those intellectually disabled patients who are "deemed competent to make informed decisions" are "allowed to refuse examination/treatment." Joint Appendix at 196-97.

For intellectually disabled patients who do not have the mental capacity to make medical decisions, the 2003 policy allows the MRDDA Administrator to authorize medical treatment only when, among other requirements, the patient has been "certified as an incapacitated individual" and "two (2) licensed physicians have certified, in writing, that the health care service, treatment, or procedure is clinically indicated to maintain the health of the [patient]." *Id.* at 204. The policy further provides that "[e]fforts should be made to provide information and explanations at the level of [patient] comprehension." *Id.* at 203. In other words, MRDAA must discuss the proposed treatment with the intellectually disabled patient. The policy also states that family members and guardians should receive notice of recommended medical treatment and be "given an opportunity to grant consent." *Id.* at 204. If "there is no family member[] or other person available or willing to provide consent," however, the MRDDA Administrator may authorize the surgery. *Id.*

2. Plaintiffs filed suit and alleged that MRDDA violated District of Columbia law, as well as their due process rights under the Fifth Amendment, by authorizing surgeries on them

without considering their wishes.  It is undisputed that plaintiffs have always lacked "sufficient mental capacity to appreciate the nature and implications of a health-care decision, make a choice regarding the alternatives presented or communicate that choice in an unambiguous manner."  D.C. Code § 21-2202(5); *see also Does I Through III*, 232 F.R.D. at 32; Tr. of Oral Arg. at 21, 27. The District of Columbia has argued that it legally and logically cannot consider the wishes of patients who lack – and always have lacked – mental capacity to make independent medical decisions because "there is no information about what they would want if they were *not* incapacitated."  *Does v. District of Columbia*, 374 F. Supp. 2d 107, 115 (D.D.C. 2005) (internal quotation marks omitted) (emphasis in original).  The District of Columbia points out that consideration of the wishes of a patient who lacks mental capacity to make healthcare decisions could lead to denial of essential medical care to a patient who purportedly did not want it – even though the patient by law has always lacked the mental capacity to make such a decision.

The District Court concluded that "[e]ven a legally incompetent, mentally retarded individual may be capable of expressing or manifesting a choice or preference regarding medical treatment."  *Id.* (internal quotation marks omitted).  The court thus held that the District of Columbia's 2003 policy – which is based on the statutory "best interests" standard rather than the "known wishes" standard – is inconsistent with D.C. statutory law, "violates plaintiffs' and the class members' liberty interest to accept or refuse medical treatment and is therefore an unconstitutional infringement of the substantive and procedural due process rights of plaintiffs and their fellow class members." *Does I Through III*, 232 F.R.D. at 34.  The District Court permanently enjoined the District of Columbia from authorizing elective surgeries for MRDDA patients under its present policy, ruling that MRDDA must follow the "known wishes of the patient" standard in determining whether to authorize surgeries

on MRDDA patients. *Id.* The court ordered the District of Columbia to make "documented reasonable efforts to communicate" with patients "regarding [their] wishes." *Id.* If a patient's wishes still remain unknown after such inquiry, however, the court held that the District of Columbia should determine the patient's "best interests" by considering the "totality of [the] circumstances." *Id.*

On appeal, the District of Columbia argues that neither (i) D.C. statutory law nor (ii) the Due Process Clause of the Fifth Amendment requires MRDDA to consider the healthcare wishes of intellectually disabled patients (such as the plaintiffs here) who have always lacked mental capacity to make healthcare decisions for themselves. We exercise de novo review over those legal questions. *Arrington v. United States*, 473 F.3d 329, 333 (D.C. Cir. 2006).

II

We first consider whether the 2003 policy is consistent with D.C. statutory law. Under the 2003 D.C. policy, the MRDDA Administrator may authorize medical treatment for an intellectually disabled patient who has always lacked the mental capacity to make medical decisions only if: (i) two physicians have certified that the proposed surgery is "clinically indicated to maintain the health" of the patient; (ii) D.C. caregivers have made efforts to discuss the surgery with the patient at the level of patient comprehension; and (iii) no guardian, family member, or other close relative, friend, or associate is available to otherwise consent or withhold consent. When those conditions are met, the Administrator's practice is to authorize the surgery, because the surgery is deemed in the patient's "best interests" under D.C. law.

The class representatives argue that D.C. statutory law requires more, however, and that MRDDA must consider the wishes even of persons who have always lacked mental capacity to make medical decisions, such as the class members here. In other words, plaintiffs argue that the "known wishes" standard of the D.C. Code applies rather than the "best interests" standard. The District of Columbia responds that D.C. statutes do not (and logically could not) require MRDDA to consider the wishes of those intellectually disabled patients who have always lacked the mental capacity to make medical decisions for themselves. *See* D.C. Code § 21-2204(b) (providing that determination of incapacity requires certifying physicians to provide in writing "clear evidence that the person is incapable of understanding the health-care choice, making a decision concerning the particular treatment or services in question, or communicating a decision even if capable of making it"). Moreover, the District of Columbia points out that considering the wishes of a patient who has always lacked mental capacity could result in the incorrect denial of medical treatment, cause the death or serious injury of patients, and trigger a host of ethical and legal problems.

We agree with the District of Columbia that the "best interests" standard – not the "known wishes" standard – applies to medical decisions for intellectually disabled individuals who have always lacked the mental capacity to make those decisions for themselves. The D.C. Code provides that a "decision to grant, refuse or withdraw consent" on behalf of a patient who lacks the mental capacity to make medical decisions "*shall be based on* the known wishes of the patient" if those wishes are ascertainable. *Id.* § 21-2210(b) (emphasis added). But "if the wishes of the patient are unknown and cannot be ascertained," the decision "*shall be based on . . . a good faith belief as to the best interests of the patient*." *Id.* (emphasis added). It is undisputed here that plaintiffs have always lacked "sufficient

mental capacity to appreciate the nature and implications of a health-care decision, make a choice regarding the alternatives presented or communicate that choice in an unambiguous manner." *Id.* § 21-2202(5); *see also Does I Through III v. District of Columbia*, 232 F.R.D. 18, 32 (D.D.C. 2005); Tr. of Oral Arg. at 21, 27. Because plaintiffs have never been able to make informed choices regarding their medical treatment, their true wishes with respect to a recommended surgery "are unknown and cannot be ascertained" for purposes of § 21-2210(b). Therefore, the District of Columbia is correct that the "best interests" standard applies to the class of plaintiffs in this case.

D.C. case law confirms our reading of the statutory text. As the D.C. Court of Appeals has stated, those statutes were "designed to address situations in which doctors, family members, and the courts may be required to make treatment decisions for a patient *who has become unable* to decide such matters for himself or herself." *Khiem v. United States*, 612 A.2d 160, 169 (D.C. 1992) (emphasis added). As that court has explained, an incompetent patient can fall into one of two categories: (i) those who were once competent to make healthcare decisions for themselves; and (ii) those who have never been competent. The distinction is critical because the competent person's pre-existing wishes (as best they can be determined) must be followed "in cases of adults who at one time were competent but later became incompetent." *In re K.I.*, 735 A.2d 448, 455 (D.C. 1999). By contrast, if a patient has *never* been competent to make medical decisions, D.C. courts have concluded that D.C. statutes require the decision be made by assessing the patient's "best interests," particularly their medical needs as determined by medical doctors. In *In re K.I.*, the court thus affirmed the trial judge's determination that "the best interests of the child rather than the substituted judgment standard applied 'in cases involving minor respondents who

have lacked, and will forever lack, the ability to express a preference regarding their course of medical treatment.'" *Id.* at 452, 456.

The class representatives rely on the decision of the D.C. Court of Appeals in *In re A.C.* But that case involved a patient who had once been competent to make healthcare decisions on her own. *See* 573 A.2d 1235, 1249 (D.C. 1990). The decision in *In re A.C.* therefore does not support the conclusion that MRDDA must somehow try to ascertain the wishes of patients who have never had the mental capacity to make decisions for themselves. *See id.* at 1246 ("incompetent patients . . . have just as much right as competent patients to have their decisions made *while competent* respected") (emphasis added); *id.* at 1243 (observing "the tenet common to all medical treatment cases: that any person has the right to make an informed choice, *if competent to do so*, to accept or [forgo] medical treatment") (emphasis added). Indeed, as explained above, the D.C. Court of Appeals has noted that the standard set forth in *In re A.C.* applies "in cases of adults who at one time were competent but later become incompetent." *In re K.I.*, 735 A.2d at 455. Contrary to plaintiffs' suggestion, therefore, nothing in the *In re A.C.* decision supports the conclusion that the wishes of a patient who has never been competent must be considered by a person charged with making medical decisions on his or her behalf.

It bears mention that the approach of plaintiffs' counsel has the potential for grave consequences. Their position would require MRDDA to give effect, at least in some cases, to the medical wishes of patients who by definition lack "sufficient mental capacity to appreciate the nature and implications" of the preference expressed. D.C. Code § 21-2202(5). As a result, MRDDA could be required to deny essential medical care to a patient who purportedly did not want it – even though the patient by law lacked the mental capacity to make that decision.

The result could be serious injury or death to the patient, and great potential for abuse and confusion. Not surprisingly, so far as we are aware, no state applies the rule suggested by plaintiffs.

In sum, we hold that the 2003 policy complies with D.C. law.

III

Plaintiffs also contend that the District of Columbia's 2003 policy is inconsistent with what they describe as their procedural and substantive due process rights.

To reiterate, under the 2003 policy at issue here, the MRDDA Administrator authorizes surgery for an intellectually disabled patient who has always lacked mental capacity to make medical decisions only if: (i) two physicians have certified that the proposed surgery is "clinically indicated to maintain the health" of the patient; (ii) D.C. caregivers have made efforts to discuss the surgery with the patient at the level of patient comprehension; and (iii) no guardian, family member, or other close relative, friend, or associate is available to otherwise consent or withhold consent.

Plaintiffs argue that this policy violates their right to due process because it does not require the MRDDA Administrator to consider an intellectually disabled patient's wishes in deciding whether to authorize surgery. But as we explained above, accepting the wishes of patients who lack (and have always lacked) the mental capacity to make medical decisions does not make logical sense and would cause erroneous medical decisions – with harmful or even deadly consequences to intellectually disabled persons. Consideration of the wishes of patients who are not and have never been competent is therefore not required by the Supreme Court's procedural due process

cases. *Cf. Washington v. Harper*, 494 U.S. 210, 226 (1990) (upholding state policy allowing prison to administer medication to mentally ill prisoners); *see also Heller v. Doe*, 509 U.S. 312, 332 (1993) ("At least to the extent protected by the Due Process Clause, the interest of a person subject to governmental action is in the accurate determination of the matters before the court . . . .").

Plaintiffs also try to make out a *substantive* due process claim (as distinct from their procedural due process claim). Even assuming their complaint about procedures used by MRDDA can be properly shoehorned into a substantive due process claim, plaintiffs have not shown that consideration of the wishes of a never-competent patient is "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if [the asserted right] were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations and quotation marks omitted).

Plaintiffs rely on *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990), which held that the Due Process Clause permits a state to require clear and convincing evidence of an incompetent patient's wishes – articulated when she was competent – as to the withdrawal of life-sustaining treatment. *Id.* at 284. As the Second Circuit has correctly explained, however, nothing in *Cruzan* supports the view that a person who has *never* had the capacity "to make an informed and voluntary choice" with respect to medical treatment has a constitutional right under the Due Process Clause to have his or her wishes considered. *Id.* at 280; *see Blouin v. Spitzer*, 356 F.3d 348, 360 (2d Cir. 2004) ("*Cruzan* . . . rests solely on the patient's capacity to express her intention regarding the course of her medical treatment; a capacity that Nancy Cruzan once possessed but that Sheila Pouliot [the plaintiff] never did.").

Finally, we note that the breadth of plaintiffs' constitutional claims is extraordinary because no state of which we are aware applies the rule suggested by plaintiffs. Plaintiffs apparently are arguing, therefore, that all states' laws and practices with respect to medical treatment for intellectually disabled individuals who have never been competent are inconsistent with the Constitution. *Cf., e.g.*, *In re Christopher*, 106 Cal. App. 4th 533, 549 (Cal. Ct. App. 2003) (test based on the presumed wishes of the patient "assumes some understanding of the patient's wants, desires, feelings, and previous mental and physical states," and "is therefore an inappropriate tool for making medical decisions for patients . . . who [have] never been competent to make [their] own decisions or express [their] emotions and feelings on the subject"); *Guardianship of Doe*, 583 N.E.2d 1263, 1268 (Mass. 1992) (requirement that state determine what incompetent patient would have wanted if competent is a "legal fiction" as applied to a never-competent person); *In re Storar*, 420 N.E.2d 64, 72 (N.Y. 1981) ("it is unrealistic to attempt to determine whether [a patient suffering from cancer] would want to continue potentially life prolonging treatment if he were competent" if patient has been profoundly intellectually disabled for most of his life); *see also* Norman L. Cantor, *The Relation Between Autonomy-Based Rights and Profoundly Mentally Disabled Persons*, 13 ANNALS HEALTH L. 37, 42 (2004) (surrogate "cannot protect a never-competent patient's right of self-determination" because a "profoundly disabled person has never been able to make autonomous choices"); John A. Robertson, *Cruzan and the Constitutional Status of Nontreatment Decisions for Incompetent Patients*, 25 GA. L. REV. 1139, 1194 (1991) (best interests test "has wide support when the patient never was previously competent but a decision must be made, as occurs with pediatric patients and patients who have always been retarded"); American Association on Mental Retardation/Association for Retarded Citizens Position Statement on Health Care for the Intellectually

Disabled, *available at* http://www.aamr.org/Policies/pos_health-care.shtml ("decision to accept or refuse treatment requires informed consent," which means that "the individual decision-maker or surrogate decision-maker" must have "the legal capacity to give consent"; decisionmaking in those circumstances "must always be consistent with the best interests of the individual").

In sum, plaintiffs' constitutional claims are meritless.

## IV

We conclude that, to the extent challenged in this case, the 2003 policy is consistent with D.C. statutory law and the Due Process Clause of the Fifth Amendment. We therefore reverse the District Court's grant of summary judgment, vacate the District Court's injunction, and direct the entry of judgment for defendants with respect to plaintiffs' claims for declaratory and injunctive relief. Pending before the District Court are also individual damages claims brought by Jane Doe I, Jane Doe II, and Jane Doe III based on alleged incidents that occurred more than a decade ago, before adoption of the 2003 policy. The damages claims are not before us, and we therefore do not address them.

*So ordered.*